In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
**NO. 09-19-00206-CR**

**CRAIG LEE ANDERSON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court
Jefferson County, Texas
Trial Cause No. 18-30269**

**MEMORANDUM OPINION**

Craig Lee Anderson appeals his first-degree felony conviction for arson of a habitation. *See* Tex. Penal Code Ann. §§ 28.02(a)(2), (d)(2). The State alleged two enhancements for prior felony convictions to which Anderson pled "true," increasing the range of possible punishment. *See id.* § 12.42(c)(1). The jury assessed punishment at fifteen years of confinement, and the trial court sentenced Anderson accordingly. In three issues, Anderson challenges the sufficiency of the evidence arguing: (1) the evidence was insufficient to support the conviction; (2) the trial court

committed reversible error by commenting on the weight of the evidence to support the enhancement allegations; and (3) he was denied an impartial tribunal resulting in a denial of due process and a fair trial. For the following reasons, we affirm the trial court's judgment.

## I. Background

Anderson and Jamalliar Sadler had been in a dating relationship for approximately four and a half years when they moved into a home together in Port Arthur, Texas. Sadler's teenage son also resided with them. They rented the home from Beverly Higgins and her husband. Anderson and Sadler had not resided in the home long when their relationship soured, and Sadler moved out. In a string of phone calls and text messages, Anderson threatened to burn Sadler's possessions, at which point Sadler called the authorities. The police arrived at the rental home, entered through unlocked doors, and observed smoke. The Port Arthur Fire Department (PAFD) also responded to the scene.

### A. Evidence

#### 1. Beverly Higgins's Testimony

Beverly Higgins was the State's first witness. She testified that she and her husband owned the home in question. Higgins said that she leased the house to Anderson, and at the time the fire occurred, he had only been leasing the home for about three months. Higgins testified that her husband received a call from the fire

2

department, and she met her husband at the house. When they arrived, motor oil had been spread all over the house in every room and Higgins described it as "just splashed everywhere[.]" Higgins testified that there were burned curtains in a back room and the wall was scorched. During Higgins's testimony, the State offered, and the trial court admitted, multiple photographs as exhibits depicting the home after the fire. These photographs showed a substance poured throughout the house, burnt curtains, and scorched walls. Higgins described these photographs and the damage to the home during her testimony.

### 2. Jamalliar Sadler's Testimony

Jamalliar Sadler, Anderson's ex-girlfriend, also testified during the State's case in chief. Sadler testified that when they moved in together, she and Anderson were not getting along, but they were going to "give it a chance." She confirmed that neither she nor Anderson owned the home. At some point, their disagreements became such that she and her son moved out. When she left and took her son, there was still animosity between her and Anderson so she did not tell him where she was going. Sadler testified that Anderson called her and sent text messages in an attempt to reach her, and copies of text messages between them were admitted as exhibits during her testimony. In one of these texts, Anderson told her that "stuff of yours is going up in smoke." Sadler explained that meant to her that Anderson was "trying to tell me he's going to burn my stuff." Sadler further testified that she received a

phone call from Anderson about 1:19 a.m. telling her the "house burned, stuff in the house is on fire[,]" and he was going to "[p]our oil on everything . . . [a]nd burn it."

After Anderson's phone call, Sadler called the police and asked them to check on the house. Sadler explained that the police checked the home and called to tell her that as soon as they opened the door, they saw smoke coming out and the house was on fire. Sadler testified that she went to the home the next day and described for the jury that the fire damage included the walls and curtains, and there was "oil everywhere." Sadler testified that she had to throw her son's things away because they were soaked in oil. Sadler testified that none of the damage exhibited in the photographs existed when she left the home, and fire caused the damage on the night of the phone call.

### 3. Michael Adaway's Testimony

Michael Adaway is a Captain for the PAFD and was dispatched to the address in question around 1:30 a.m. When they arrived, they were able to walk into the home because the doors were unlocked. Adaway described the house as having "very light smoke throughout[.]" It also appeared as if someone poured some substance over belongings and throughout the house on the floor and walls. Adaway testified that the substance on the floor appeared to be motor oil. He testified that while gasoline burns very quickly, oil is not easy to ignite and requires a very high temperature to get it to burn and to keep it burning.

4

When asked where the fire originated, he said some mini blinds appeared to have melted and there were some curtains that were partially burned. There was nothing smoldering when they arrived, so they did not have to extinguish any fire. Adaway said they used their thermal imager to make sure there were not any hot spots remaining in the house before they left.

**4. Joe Pirtle, Jr.'s Testimony**

Joe Pirtle, Jr. testified that he is the PAFD's Deputy Fire Marshal over investigations and inspections and has worked for PAFD for twenty-four years. He explained that his job duties include conducting arson and cause of origin investigations. He has been actively investigating arson cases since 2001 or 2002.

Pirtle testified that on July 7, 2017, he went to the house in question, but when he arrived, it was not actively burning. He told the jury that he walked around outside the house, but he did not find anything of interest related to the fire.

Pirtle then "enter[ed] the structure and look[ed] for any burn patterns[.]" Pirtle testified that he found a substance poured all over the house that appeared to be motor oil and multiple fires started in different areas of the home that were not connected in any way. Pirtle explained that motor oil burns hot, but in order to get it going, you must light it with something hot; "you can't light motor oil usually with just a lighter or something."

Pirtle testified there were multiple unconnected burnt areas. He explained that with accidental fires, like electrical, something will usually originate in one spot, whereas when you see multiple spots on fire that are not connected, somebody lit those fires separately. Once Pirtle found multiple unconnected fires, he began looking for "natural heat sources[,]" like electrical outlets, in order to rule them out. Pirtle said he could not pinpoint where the fire started; it looked like somewhere on the curtains, but he could not tell for sure. Pirtle opined that it was an incendiary fire, which he explained meant the fire was intentionally lit by someone. When asked what kind of charge it is called when someone intentionally sets fire to something, Pirtle responded, "Arson."

**5. Marcelo Molfino's Testimony and Cell Phone Records**

Marcelo Molfino, a Criminal Investigator with the Jefferson County District Attorney's Office, also testified for the State. Molfino explained that his job included looking at cell phone records, like the call detail records in question in this case. Molfino described T-Mobile records for a number belonging to Craig Anderson and said the records were obtained through a search warrant. These records were admitted into evidence. Molfino described the software they used to break down the records into dates, times, and the length of the calls.

The State introduced a call log from Anderson's phone, which Molfino discussed. Molfino testified the records showed an outgoing call from Anderson's

6

phone to Sadler's phone at 1:19 a.m. that lasted twelve seconds and the call was completed successfully. Molfino explained that the call Anderson made at 1:19 a.m. hit a tower "just a couple of blocks" from the fire's location, leading him to conclude that at 1:19 a.m. on July 7, 2017, Anderson's phone was in the general area of the fire's location.

**6. Esau Anderson, Jr.'s Testimony**

The defense called Anderson's older brother, Esau, to testify. Esau testified that on the evening in question, he received a text message from Sadler at 1:21 a.m., telling him what his brother did. After receiving Sadler's message, Esau went to their mother's house where he found Anderson asleep. On cross-examination, Esau explained that he had seen his brother earlier in the evening, but he was not with Anderson for several hours as Anderson told investigators, and Esau was at his own home when the fire occurred. Esau also testified that their mother was living with him at the time and was not hospitalized in Houston, like Anderson told investigators.

**7. Antonio Mitchell's Testimony and Anderson's Sworn Statement**

Following Esau's testimony, the State called Antonio Mitchell as a rebuttal witness. Mitchell testified that he works for the PAFD where he oversees the arson investigation program. He said that he contacted Anderson, who came into the office and talked to him about the fire. Mitchell testified that Anderson said "something

7

about him being with his brother" the night of the fire. He also discussed a sworn statement Anderson signed that was admitted into evidence. In the statement, Anderson claimed he went to Houston to visit his mother in the hospital and that Esau stayed with him until around midnight.

## B. Trial Judge's Comments During Punishment

During the punishment phase, the State read the balance of the indictment, which included enhancements for two prior felony convictions. The first conviction was a second-degree felony possession of a controlled substance, and the second conviction was for a third-degree felony delivery of a simulated controlled substance. Anderson pled "true" to both enhancements.

The trial court then read the punishment charge to the jury. After reading the charge to the jury but before closing statements, the trial court told the jury, "Now two things. Number one, the paragraphs 2 and 3 are non-state jail felonies. We talked about the levels, and each of those convictions were higher than a state jail felony. So, that is by law the fact." Anderson did not object to the trial court's statement.

## C. Trial Outcome

The jury found Anderson guilty of the first-degree felony offense of arson of a habitation. Anderson pled "true" to two enhancements and was sentenced to the minimum punishment within the applicable range after enhancement, fifteen years of confinement. Anderson timely appealed.

## II. Analysis

### A. Sufficiency

In his first issue, Anderson challenges the sufficiency of the evidence to support his conviction. Anderson argues that the State failed to establish the facts alleged in the indictment and specifically contends that "[n]o rational juror could have found that appellant started a fire by igniting oil." Anderson further contends there "is a remarkable absence in the record of any evidence to establish that appellant ignited oil."

When an appellant challenges the sufficiency of the evidence, we review the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *See Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010 (citing *Jackson v. Virginia*, 443 U.S. 307 (1979)) (concluding the Jackson standard is the only standard that a reviewing court should apply when examining sufficiency); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). "[We] must evaluate all of the evidence in the record, both direct and circumstantial, whether admissible or inadmissible." *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). The jury is the sole judge of the witnesses' credibility and weight to be given their testimony. *Tate v. State*, 500 S.W.3d 410, 413 (Tex. Crim. App. 2016). We

must defer to the jury's determinations of weight and credibility of the witnesses and its responsibility to fairly resolve conflicts in testimony. *See Hooper*, 214 S.W.3d at 13; *see also Brooks*, 323 S.W.3d at 899. Juries may draw multiple reasonable inferences from facts so long as each inference is supported by the evidence presented at trial. *Tate*, 500 S.W.3d at 413. We determine whether necessary inferences are reasonable based on the combined, cumulative force of all evidence when examined in the light most favorable to the verdict. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). In conducting a sufficiency review, "we should look at 'events occurring before, during and after the commission of the offense[.]'" *See Hooper*, 214 S.W.3d at 13 (quoting *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985)).

The State charged Anderson with the offense of arson of a habitation. *See* Tex. Penal Code Ann. § 28.02(a)(2). The statute provides that "[a] person commits an offense if the person starts a fire, regardless of whether the fire continues after ignition or causes an explosion with intent to destroy or damage . . . any building, habitation, or vehicle[.]" *Id.* Here the State specifically alleged in the indictment that Anderson "did then and there intentionally and knowingly start a fire, by igniting oil, with intent to damage and destroy a habitation . . . and the Defendant knew that the property was owned by another[.]"

10

Testimony at trial revealed that Anderson and Sadler had recently had a contentious breakup, which resulted in Sadler moving out of the home they rented together. The evidence at trial established that Anderson sent Sadler text messages shortly before the fire and threatened that "stuff of yours is going up in smoke." Sadler also testified that Anderson called her at 1:19 a.m. telling her that the "house burned, stuff in the house is on fire[,]" he "pour[ed] oil on everything[,]" and he "burn[ed] it." Additional evidence in the form of cell phone records and a criminal investigator that analyzes cell tower data confirmed Anderson called Sadler from his cellphone and the call pinged a tower within blocks of the fire's location at 1:19 a.m.

PAFD employees testified that there was a substance that appeared to be consistent with motor oil poured throughout the home. Photographic evidence admitted at trial showed a black substance consistent in appearance to motor oil in nearly every room in the home on the floors, walls, and personal belongings. Sadler's testimony described her observations of the home the day after the fire, which included that there was oil everywhere, the room was burned, the walls were burned, and the curtains were burned. Sadler testified that before Anderson called her that night, there had been no previous fire in the home; she called police immediately after he called her, and the police found fire damage to the home when they arrived shortly after Anderson's call to Sadler.

When the fire department arrived, they observed smoke in the house and burned areas around the windows. Deputy Marshal Pirtle confirmed that the substance poured around the home appeared to be motor oil. Pirtle explained that motor oil burns hot, but in order to get it going, you must light it with something extremely hot. He testified that "you can't light motor oil usually with just a lighter or something. You have to get something else going to get the motor oil going." Pirtle also testified that he found evidence of multiple unconnected fires in the home, and when he began looking for heat sources that may have accidentally caused the fires, he could not find any. Pirtle explained to the jury that accidental fires usually originate in one spot, whereas when you see multiple unconnected fires, someone has intentionally lit them. Ultimately, Pirtle opined that the fire was incendiary in nature, which meant someone intentionally lit it.

We disagree with Anderson's contention there is insufficient evidence to support the jury's verdict that he "intentionally and knowingly start[ed] a fire, by igniting oil, with intent to damage and destroy a habitation[.]" A jury is allowed to draw multiple reasonable inferences. *Jackson*, 443 U.S. at 318–19; *Hooper*, 214 S.W.3d at 13. The evidence established that Anderson threatened to set fire to Sadler's things and the home. He further told Sadler that he poured oil on everything and burned it. Evidence also indicated recent fire damage to the home when the fire department arrived soon after Anderson called Sadler, and Anderson's phone was

12

shown to be within the general location of the fire at 1:19 a.m. when he called Sadler. Further, a fire investigator testified that the fire was incendiary in nature. A jury could reasonably infer that Anderson poured the oil and started fires in the home as he said he would, despite the difficulty he obviously encountered attempting to set the motor oil on fire. Moreover, the jury could reasonably infer that Anderson lit the oil and it burned out shortly thereafter. The arson statute expressly states that "[a] person commits an offense if the person starts a fire, *regardless of whether the fire continues after ignition*[.]" Tex. Penal Code Ann. § 28.02(a) (emphasis added). The fact that other items in the home, including the curtains, were also set on fire in an attempt to ignite the oil does not negate evidence supporting the jury's reasonable inferences that Anderson started a fire by igniting oil. We overrule Anderson's first issue.

## B. Trial Judge's Comments and Impartiality of Tribunal

In his second and third issues, Anderson complains that the trial court erred by commenting on the evidence to support the enhancement allegations and that he was denied an impartial tribunal resulting in a denial of due process and a fair trial. The trial court's "comments" occurred during the punishment phase after Anderson had already pled "true" to the enhancements and after the trial court read the punishment charge to the jury. The trial court told the jury that the enhancement paragraphs were "non-state jail felonies." The first enhancement read in front of the

jury regarded Anderson's final conviction of the "felony of possession of a controlled substance, second degree," to which Anderson pled "true." The second enhancement alleged Anderson's conviction for "the felony of delivery of a simulated controlled substance, third degree," to which he also pled "true."

In his brief, Anderson complains that Texas Code of Criminal Procedure prohibits a trial judge from commenting on the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.05. Anderson concedes that he failed to object to these comments but argues the issue may be raised for the first time on appeal. We agree. The Texas Court of Criminal Appeals held in *Proenza v. State*

> that claims of improper judicial comments raised under Article 38.05 are not within *Marin's* third class of forfeitable rights. Rather, we believe that the right to be tried in a proceeding devoid of improper judicial commentary is at least a category-two, waiver-only right. Because the record does not reflect that [the defendant] plainly, freely, and intelligently waived his right to his trial judge's compliance with Article 38.05, his statutory claim in this matter is not forfeited and may be urged for the first time on appeal.

541 S.W.3d 786, 801 (Tex. Crim. App. 2017) (citations omitted). Accordingly, we address the merits of Anderson's complaint despite his failure to contemporaneously object to the comments.

Assuming, without deciding, that the trial judge's comments were improper, we undertake a harm analysis. Because Anderson also asserts a due process error associated with these comments as being indicative of partiality, we will analyze

harm under the standard for constitutional errors.[1] *See* Tex. R. App. P. 44.2(a). Texas Rule of Appellate Procedure 44.2(a) provides that constitutional errors are "subject to harmless error review[.]" *Id.* In examining constitutional errors, the court "must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment." *Id.*

The State has the burden "to show that any prior conviction used to enhance a sentence was final under the law and that the defendant was the person previously convicted of that offense." *Donaldson v. State*, 476 S.W.3d 433, 439 (Tex. Crim. App. 2015) (citing *Flowers v. State*, 220 S.W.3d 919, 921 (Tex. Crim. App. 2007)). The defendant's plea of "true" satisfies the State's burden. *Id.* The trial court's comments were made during the punishment phase after Anderson had already pled true to the enhancements for two prior felony convictions, specifically, a second-degree felony and third-degree felony. Therefore, the State's burden to prove the enhancements had already been satisfied. *See id.* The trial court's comments that

---

[1] The Texas Court of Criminal Appeals also explained in *Proenza v. State* that where a criminal defendant's complaints regarding a trial court's comments are statutory only, courts of appeals should undertake a nonconstitutional harm analysis, whereas constitutional complaints require a constitutional harm analysis. 541 S.W.3d 786, 801 (Tex. Crim. App. 2017) (citations omitted); *see also* Tex. R. App. P. 44.2(a) (constitutional harm analysis); Tex. R. App. P. 44.2(b) (nonconstitutional harm analysis).

these were "non-state jail felonies" restated what Anderson admitted to before the jury. The statement by the trial court was an undisputed and uncontested fact.

Once a finding of true to the enhancement paragraph is entered, "the 'punishment is absolutely fixed' by law." *State v. Allen*, 865 S.W.2d 472, 474 (Tex. Crim. App. 1993) (quoting *Harvey v. State*, 611 S.W.2d 108, 111 (Tex. Crim. App. 1991), *cert. denied*, 454 U.S. 840 (1981)). The punishment range for a first-degree felony is 5 to 99 years, absent enhancements. *See* Tex. Penal Code Ann. § 12.32(a). With Anderson's plea of "true" to two prior non-state jail felony convictions, the enhanced punishment range increased to 15 to 99 years. *See id.* § 12.42(c)(1). The jury assessed Anderson's punishment at the minimum allowable term under the law. *See id.*; *see also Allen*, 865 S.W.2d at 474 (discussing fixed punishment ranges). Accordingly, we conclude beyond a reasonable doubt that the trial court's comments did not contribute to Anderson's punishment. *See* Tex. R. App. P. 44.2(a).

Therefore, the error, if any, was harmless. We overrule issues two and three.

### III. Conclusion

We hold the evidence was sufficient to support the jury's verdict convicting Anderson of arson of a habitation. We further conclude that Anderson was unharmed by the trial court's comments regarding the classification of his prior felony convictions to which he had already pled "true." We affirm the trial court's judgment.

16

AFFIRMED.

_____
CHARLES KREGER
Justice

Submitted on October 6, 2020
Opinion Delivered November 18, 2020
Do Not Publish

Before McKeithen, C.J., Kreger, and Horton, JJ.